**Santos Angel SOSA, Jr., and Rolando Sosa, Plaintiffs-Appellees,**

v.

**UNITED STATES of America, Defendant-Appellant.**

**No. 76–1371.**

United States Court of Appeals, Fifth Circuit.

April 8, 1977.

Edward B. McDonough, Jr., U. S. Atty., James R. Gough, Mary L. Sinderson, Asst. U. S. Attys., Houston, Tex., for defendant-appellant.

Roberto J. Yzaguirre, R. Knox Jones, McAllen, Tex., for plaintiffs-appellees.

Before TUTTLE, CLARK and RONEY, Circuit Judges.

TUTTLE, Circuit Judge:

On the strength of a "chekar" signal alone, Border Patrol agents stopped the Sosa brothers' car near Hebbronville, Texas. The agents then smelled marijuana in the car. A subsequent search confirmed that olfactory suspicion: some 71 pounds of marijuana were discovered. The trial court denied a motion to prevent use of the contraband as evidence against the Sosas, and found them guilty of possession of a controlled substance with intent to distribute it in violation of 21 U.S.C. § 841(a).

The Sosas were sentenced on June 26, 1975. They filed a notice of appeal to this Court the same day and timely met all ancillary requirements. The Supreme Court decided the case of *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), on June 30, 1975. On August 8, 1975, this Court in an unpublished opinion interpreted *Brignoni-Ponce* as requiring the reversal on direct appeal of convictions based on evidence obtained by use of the Hebbronville chekar device in circumstances identical to the Sosas' case. *United States v. Peralez*, 517 F.2d 1402 (5th Cir. 1975), *petitions for rehearing and rehearing en banc denied sub nom. United States v. Martinez*, 526 F.2d 954 (5th Cir. 1976).

On September 23, 1975, the Sosas moved this Court to dismiss their direct appeal. The motion specified that the dismissal was *requested for the purpose of permitting the trial court to act on a section 2255 motion to vacate judgment and sentence in light of our Peralez decision.*[1] The Clerk of the Court, in accordance with FRAP 42 and as required by our Local Rule 9, entered an order of dismissal. The Sosas then filed a section 2255 motion in the sentencing court. The district court, after notifying the Government and receiving an answer which

petitioners allege raised questions of law only, summarily granted the section 2255 motion. The Government now contends that the district court's order should be reversed because (1) the Sosas "deliberately bypassed" appellate review, thereby forfeiting their right to seek section 2255 relief; (2) the fourth amendment claim that the Sosas seek to raise is not cognizable in section 2255 proceedings; and (3) the district court granted the motion without holding a hearing.

## I. SURROGATE APPEAL

Although section 2255 proclaims that a "motion for such relief may be made at any time," it is a judicial commonplace that "the writ of *habeas corpus* will not be allowed to do service for an appeal," *Sunal v. Large*, 332 U.S. 174, 178, 67 S.Ct. 1588, 1590, 91 L.Ed. 1982 (1947); *accord, e. g., Adams v. United States ex rel. McCann*, 317 U.S. 269, 274, 63 S.Ct. 236, 87 L.Ed. 268 (1942). If the rule against employing habeas as a surrogate for appeal meant only that a petition should not normally be entertained while direct review is still available, application of the rule would occasion little difficulty. The rule, however, expresses substantive as well as procedural policies: in certain circumstances failure to pursue a direct appeal will be held to tilt the equities against a habeas petitioner and prevent him from obtaining collateral relief, *e. g., Hill v. United States*, 368 U.S. 424, 428–29, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962) (petitioner had not appealed trial court's failure to afford him opportunity to make statement in his own behalf at sentencing); *Sunal v. Large*, 332 U.S. 174, 177–181, 67 S.Ct. 1588, 91 L.Ed. 1982 (1947) (petitioners were part of concerted test case effort in which some judgments were appealed while others were not).

In the instant case, the Sosa brothers dismissed their direct appeal and sought section 2255 relief. The Government insists

---

1. Because the section 2255 proceeding, like habeas corpus, is equitable in nature, the sentencing court in its discretion may decline to entertain the motion while direct appeal is still available. *See* Part I *infra.* However, the statute

provides that the motion for relief may be made "at any time," and therefore the completion of appellate review is not a jurisdictional prerequisite to section 2255 relief. *See* authorities cited in note 2 *infra.*

that this action constituted a "deliberate bypass" of direct review which forecloses collateral attack. But the Government's use of the rule that habeas will not be allowed to do service for an appeal is too pat. The Government fails to show how and why the Sosas have so abused the privilege of the Great Writ as to preclude them from obtaining relief to which they are obviously otherwise entitled.

The term "deliberate bypass" is not self-executing; it depends upon legal conclusion. It encapsulates an equitable doctrine that took form as early as *Ex Parte Kearney,* 20 U.S. (7 Wheat.) 37, 42–43, 5 L.Ed. 391 (1822); *Matter of Gregory,* 219 U.S. 210, 213, 31 S.Ct. 143, 55 L.Ed. 184 (1911). The term itself entered the habeas corpus lexicon after *Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963):

> "Although we hold that the jurisdiction of the federal courts on habeas corpus is not affected by procedural defaults incurred by the applicant during the state court proceedings, we recognize a limited discretion in the federal judge to deny relief to an applicant under certain circumstances. . . . [H]abeas corpus has traditionally been regarded as governed by equitable principles. Among them is the principle that a suitor's conduct in relation to the matter at hand may disentitle him to the relief he seeks. . . . We therefore hold that the federal habeas judge may in his discretion deny relief to an applicant who has deliberately by-passed the orderly procedure of the state courts and in so doing has forfeited his state court remedies."

372 U.S. at 438, 83 S.Ct. at 848 (citation omitted).

■ Although the Supreme Court enforced the general rule against surrogate appeals in *Sunal v. Large,* 332 U.S. 174, 67 S.Ct. 1588, 91 L.Ed. 1982 (1947), the Court was careful to preserve the not inconsiderable number of exceptions to the rule, *see* 332 U.S. at 178–181 & nn. 6–13, 67 S.Ct. 1588, when "the writ has . . . been entertained either without consideration of the adequacy of relief by the appellate route or where an appeal would have afforded an adequate remedy", 332 U.S. at 178, 67 S.Ct. at 1591. The Court's catalogue of exceptions shows that the archetypal case for the application of the rule precluding collateral attack is when direct appeal has been foregone as a tactical maneuver. *See* 332 U.S. at 180–182, 67 S.Ct. 1588.

■ We thus begin with the proposition recognized in *Sunal* and respected in subsequent decisions, that failure to appeal does not, by itself, require a habeas court to deny the petition. "[T]he question rather is whether the case is one in which refusal to exercise that power [to adjudicate the merits of constitutional claims on habeas is] appropriate," *Kaufman v. United States,* 394 U.S. 217, 220 n. 3, 89 S.Ct. 1068, 1071 n. 3, 22 L.Ed.2d 227 (1969), for the rule against surrogate appeals "is not one defining power but one which relates to the appropriate exercise of power", *Bowen v. Johnston,* 306 U.S. 19, 27, 59 S.Ct. 442, 446, 83 L.Ed. 455 (1939). Our own jurisprudence traces a similar course, and consistently returns to the holding that the motivation or reason for the failure to appeal, and not the mere datum that an appeal was not taken or completed, determines whether a section 2255 motion ought to be entertained.[2] The rule against surrogate appeals is not, therefore, a strict jurisdictional requirement. Rather, it is a formulation of jurisprudential considerations that may vary as the

---

**2.** *E. g., Nash v. United States,* 342 F.2d 366, 367 (5th Cir. 1965) ("This rule, however, has never been an inflexible one, and has been relaxed in exceptional circumstances); *McKnight v. United States,* 507 F.2d 1034, 1036 (5th Cir. 1975) (eschewing wooden application of the rule: "the emphasis is not merely on the fact that an appeal was not taken, but rather on why the appeal was not taken"). Indeed, at least two other Courts of Appeals have permitted the adjudication of section 2255 motions while a direct appeal was pending or still available. *United States v. McCord,* 166 U.S.App.D.C. 1, 509 F.2d 334, 340 n. 6 (1974); *Masters v. Eide,* 353 F.2d 517, 518 (8th Cir. 1965) (per curiam); *see* Rules Governing Section 2255 Proceedings, Advisory Committee Notes to Rule 5 ("There is no [statutory] requirement that the movant exhaust his remedies prior to seeking relief under § 2255.").

equities of a case vary. We believe the equities weigh heavily in the Sosas' favor.

Our consideration of the Sosas' claim is not uninfluenced by the fact that our own procedures may have contributed to the problem. The motion for dismissal clearly states the Sosas' intention to dismiss the direct appeal *in order to seek section 2255 relief.* If we had specifically authorized the dismissal as a prelude to section 2255 proceedings, Rule 42(b) of the Federal Rules of Appellate Procedure, which provides that an "appeal may be dismissed on motion of the appellant upon such terms as may be agreed upon by the parties or fixed by the court", would conclude the matter. However, our own Local Rule 9(a) makes perfunctory our approval of motions for voluntary dismissal.[3] Thus, although we cannot be said to have countenanced the Sosas' action, we are reluctant to limit the exercise of an essentially equitable authority where the circumstances so visibly show the Sosas' good faith and our own indirect responsibility for their present predicament.

The Government reads several of our prior decisions as supporting its characterization of the Sosas' actions as a deliberate bypass. A careful analysis of those cases, however, leads to the opposite conclusion. In *Larson v. United States,* 275 F.2d 673 (5th Cir. 1960), the petitioner had not appealed from a conviction and life sentence in a murder trial. His codefendant, who had been sentenced to die, appealed and eventually won retrial in circumstances that "reduced almost to zero" the "risk of a death sentence" for Larson, 275 F.2d at 675. We affirmed the district court's denial of Larson's subsequent section 2255 motion on the ground that his failure to appeal was part of a "considered strategy not to jeopardize his life by running the risk of a new trial," 275 F.2d at 674; *see* 275 F.2d at 679–80.

Equally wayward is the Government's citation of *Montgomery v. Hopper,* 488 F.2d

877 (5th Cir. 1973), for in that case we pointed out that not all intentional failures to appeal can be labeled as the "deliberate bypass" which also carries the prisoner past collateral attack. The Court explained:

"The term 'deliberate bypass' is one of art. . . . The circumstances revealed by this record fall short of authorizing the conclusion that [the petitioner] deliberately bypassed his right of appeal . . . to gain any tactical or strategic advantage in the pursuit of his claims." 488 F.2d at 879–80.

The Sosas, appellees here, contend that they only "tried to expedite the instant case at the least expense and with the least inconvenience to this Court." We agree. They were free on bond pending appeal, so the section 2255 motion could secure them no particular tactical advantage over direct appeal as a means of avoiding imprisonment. No legal machinations appear to have influenced their decision. True, the *Peralez* case might have been reversed *en banc,* but the section 2255 proceedings would have been reviewable in this Court had *Peralez* gone the other way *en banc.* And since the only issue was the legality of the stop, the section 2255 motion offered no prospect that a nonappealable judgment of acquittal would be entered by the district court.

■ While we strongly discourage the withdrawal of a direct appeal in favor of a section 2255 motion, we see no reason to administer the rather harsh punishment demanded by the Government for conduct which, at worst, amounts to an excess of zeal. Our cases firmly reject any rigid application of the rule against surrogate appeals. Instead, they establish the principle that habeas will not be permitted to substitute for an appeal when the choice to seek habeas relief is made in order to seize some legal or tactical advantage for the defendant. No such ulterior purpose has been

---

3. Rule 9(a) provides: "In all cases where the appellant or petitioner files a motion to withdraw his appeal or agency review proceeding, the Clerk, after notice to the opposing party, shall enter the case dismissed or withdrawn and issue a copy of the entry to the Clerk of the District Court as and for the mandate, and to the parties."

shown to have directed the Sosas' actions. We therefore hold that the district court properly entertained the section 2255 motion despite the fact that the direct appeal had been voluntarily dismissed.

## II. THE EXCLUSIONARY RULE AND COLLATERAL ATTACK

■■■ Recent Supreme Court decisions demonstrate that the exclusionary rule should be treated as a "judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than [as] a personal constitutional right of the party aggrieved", *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974); *accord, United States v. Peltier,* 422 U.S. 531, 538–39, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975). The Court's holding in *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), that a state prisoner afforded an adequate opportunity to contest the admission of illegally seized evidence at his state trial is not entitled to federal habeas corpus consideration of such a claim, confirms that the exclusionary rule, while constitutionally inspired, is not constitutionally required. Hence, the Government contends, the same considerations which led the Supreme Court to disapprove the application of the exclusion rule by federal habeas courts as a remedy for fourth amendment violations brought to their attention by state prisoners, should spur us to restrict similarly the remedial powers of a section 2255 court.

■■■ In *Kaufman v. United States,* 394 U.S. 217, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969), the Supreme Court held that fourth amendment exclusionary rule claims are cognizable in section 2255 proceedings. We need not now decide whether *Stone v. Powell,* a state prisoner case, overruled *Kaufman sub silentio,* because *Stone's* precondition for the denial of the exclusionary rule remedy by a habeas court has not been fulfilled in the special and unique circumstances of this case. *Stone* held that a habeas court should not order the suppression of illegally seized evidence when the petitioner has been "provided an opportunity for full and fair litigation of [his] Fourth Amendment claim" by state tribunals. 428 U.S. at 482, 494, 96 S.Ct. at 3046, 3052. We recently interpreted the meaning of "full and fair consideration" in *O'Berry v. Wainwright,* 546 F.2d 1204 (5th Cir. 1977). There, we held that the "opportunity for full and fair consideration" must include at least one evidentiary hearing in a trial court and one decision by an appellate court which, if "presented with an undisputed factual record, gives full consideration to [the prisoner's] Fourth Amendment claims." [4]

*Stone v. Powell* is inapposite to the instant case even if its rule is transposed to section 2255 proceedings. In the special circumstances of this case, the section 2255 proceedings served—but not improperly—as the appellate review which our *O'Berry* decision requires. Consequently, when the Sosas sought section 2255 relief, they had not yet had an "opportunity for full and fair consideration" of their fourth amendment claims.

This opinion through Section II is concurred in by all judges. The succeeding Section III and the judgment of the Court are concurred in by Judges Clark and Roney. Judge Tuttle files a separate opinion

---

4. Our full explanation of the nature of that "opportunity" was as follows:

"We conclude that where there are *facts* in dispute, full and fair consideration requires consideration by the fact-finding court, and at least the availability of meaningful appellate review by a higher state court. Where, however, the facts are undisputed, and there is nothing to be served by ordering a new evidentiary hearing, the full and fair consideration requirement is satisfied where the state appellate court, presented with an undisputed factual record, gives full consideration to defendant's Fourth Amendment claims. Such a distinction makes practical sense because it ensures that a criminal defendant is given a full hearing on his Fourth Amendment claims and the facts underlying those claims at least once at the state level, but it does not require the State to hold evidentiary hearings which would be useless and inefficient."
546 F.2d at 1213.

dealing with the construction of section 2255.

## III. REQUIREMENT OF A HEARING

Section 2255 provides in pertinent part:

"Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto."

28 U.S.C. § 2255.

■ The Government argues that this language must be taken literally and that section 2255 mandates a hearing whenever the files and records do not make manifest the invalidity of the claim, including those cases in which the files and records conclusively show that the prisoner is entitled to full relief as a matter of law. According to the Government, the statute forces the trial court to conduct a hearing whenever the petitioner's claim is plausible enough to cause the statutory "notice" to be served upon the United States Attorney.

This Court has recently construed this language in *Ferrara v. United States,* 547 F.2d 861 (5th Cir. No. 76–1426, 1977) in a manner consistent with the Government's contention. While the *Ferrara* case dealt with a section 2255 motion in which there was a disputed fact issue, which may distinguish it from this case, we conclude that the preferred manner to deal with the Sosas' section 2255 case is to remand it to the trial court to permit the Government to have a hearing in support of its defense.

The judgment is VACATED and the case is REMANDED for further proceedings not inconsistent with this opinion.

1. "Literal meaning is the meaning carried by language when it is read in its dictionary sense unaffected by considerations of particular context. Although literal meaning sometimes coincides with . . . true meaning, as where language is read out of context or where its meaning is unaffected by the context in which it is or should be read, more often that context

## SEPARATE OPINION OF JUDGE TUTTLE:

With deference, I do not agree with the disposition of this case which requires another trip to the district court probably followed by another appearance here, when I am convinced that the trial court had full power to grant the section 2255 motion without a hearing.

As noted, I agree with the Court in holding that the section 2255 motion was properly filed. I disagree only in the construction of section 2255, since I am convinced that the requirement of a hearing was intended by Congress as protection for the petitioner only in that it was to prevent summary dismissals of section 2255 motions. The right of the Government to a hearing if only legal questions were presented and the petitioner's right to relief was clear was not, I have concluded, within the purpose of Congress in enacting the statute. I suppose the most difficult burden is the thesis that "plain language" does not always mean what it says. Nevertheless, because I believe that proper standards of statutory construction demand it, I feel it necessary to try to carry that burden.

### A. The "Plain Meaning" Approach to Statutory Construction

I reject at the outset the notion that the "literal terms" or "plain meaning" of the statute obviates the need for further analysis. The literal meaning of a statute is, after all, no more than that meaning which is most linguistically probable.[1] The literal terms of a statute certainly do not preclude the very real possibility that Congress employed a particular collocation of words to effect a somewhat different purpose than that which might be inferred from the definitions of an unabridged dictionary.[2] This is particularly true where, as in the instant

yields a meaning significantly different from its literal meaning." R. Dickerson, The Interpretation and Application of Statutes 38 (1975).

2. Statutory language drafted in response to a broad range of problems may literally encompass situations quite unlike those types of cases which most concerned the draftsmen.

case, the scope of a fairly clear statutory provision is questioned. Thus, the Supreme Court has often tempered the literal force of all-embracing statutory language in order to avoid untoward results. For example, in *Price v. Johnston,* 334 U.S. 266, 285–86, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948), the Court held that although the literal terms of 28 U.S.C. § 394 guaranteed all litigants an "otherwise unqualified right" to *pro se* appellate argument, that right could "be circumscribed as to prisoners [seeking habeas corpus] where reasonable necessity so dictates." Similarly, in *Standard Oil Co. v. United States,* 221 U.S. 1, 63–70, 31 S.Ct. 502, 517, 55 L.Ed. 619 (1911), the Court announced the famous "rule of reason" and specifically rejected the argument that Sherman Act section 1 "embraces every contract . . . in restraint of trade, and hence its text leaves no room for the exercise of judgment, but simply imposes the plain duty of applying its prohibitions to every case within its literal language."

The "plain meaning" approach to statutory construction simply begs the question. In every case where the scope or terms of a statutory provision are subject to reasonable dispute, the issue is *which* meaning is "plain." To say, without elaboration, that one possible interpretation is "plain" and that another possible interpretation is "not plain," obscures rather than clarifies the decisionmaking process. A court which employs the "plain meaning" approach and interprets the terms and scope of a statute literally, without inquiring whether that literal meaning is consistent with Congress' purpose in enacting the statute, fails to respect adequately Congress' lawmaking power. For these reasons, the Supreme Court repudiated the "plain meaning" approach nearly forty years ago:

"Often [the words of a statute] are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed that purpose, rather than the literal words. When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.'" *United States v. American Trucking Ass'n,* 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940).

Any reliance on a literalist or "plain meaning" approach to section 2255 also ignores the history of the Supreme Court's construction of the statute. In the landmark decision of *Sanders v. United States,* 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963), another case in which the scope of a fairly unambiguous provision of section 2255 was disputed, the Court refused to adopt a literal construction of language in section 2255 which provides that the "sentencing court shall not be required to entertain a second or successive motion for similar relief on behalf of the same prisoner." Instead, the Court first noted that Congress' purpose had been to make the section 2255 motion remedy as broad as habeas corpus, and that the habeas corpus statute (section 2244) authorized summary disposition of successive applications only when the petition raised "no new ground not theretofore presented." *Sanders* therefore held:

"[T]here is an apparent verbal discrepancy [between section 2244 and 2255]. Under § 2255, [the 'similar relief'] language might seem to empower the sen-

When an apparently unanticipated application of a statute is in the offing, a court should attempt to reconcile the interpretation of the statute in marginal situations with the legislative purpose evidenced by the paradigm cases to which the statute speaks. H. M. Hart & A. Sacks, The Legal Process: Basic Problems in the Making and Application of Law 1156–57, 1200, 1220–21, 1414–15 (1958).

tencing court to apply *res judicata* at will, since even if a second motion is predicated on a completely different ground . . . the prisoner ordinarily will be seeking the same 'relief'. . . . *But the language cannot be taken literally.* . . . [because a section 2244 applicant] would not enjoy the 'same rights' as the habeas corpus applicant . . .. We therefore hold that the 'similar relief' provision of § 2255 is to be deemed the material equivalent of § 2244."

373 U.S. at 12–13, 83 S.Ct. at 1075–1076 (Emphasis added).

A substantial array of authority can be marshaled behind the proposition that no

**3.** *E. g., Forrester v. United States,* 456 F.2d 905 (5th Cir. 1972), *cert. denied* 409 U.S. 856, 93 S.Ct. 136, 34 L.Ed.2d 101; *Finley v. United States,* 296 F.2d 238 (5th Cir. 1961) (per curiam); *United States v. Hester,* 489 F.2d 48, 50 (8th Cir. 1973) (per curiam); *Mixen v. United States,* 469 F.2d 203, 205 (8th Cir. 1972), *cert. denied* 412 U.S. 906, 93 S.Ct. 2297, 36 L.Ed.2d 971; *United States v. Meyer,* 417 F.2d 1020, 1024 (8th Cir. 1969).

**4.** I emphasize that no factual issues were contested. In its response to the Sosas' section 2255 motion, the Government contended (1) that the Sosas had "deliberately bypassed appellate review," (2) that "the search complained of . . . was based upon probable cause. *United States v. Santibanez,* 517 F.2d 922 (5th Cir. 1975)," and (3) that "there was reasonable suspicion to stop the vehicle for a routine immigration inspection, considering the notoriety of Texas Highway 16 and Farm Road 3073 as smuggling route, and the time of night."

As indicated in Part I, *supra,* deliberate bypass is a question of law, not of fact, and neither in its response to the Sosas' motion nor in this Court has the Government alleged any facts different from those conclusively shown by the files and records. Since the Government was attempting to characterize undisputed facts as a "deliberate bypass," rather than offering to prove new facts in support of such a contention, no evidentiary hearing was required to determine the deliberate bypass claim.

In contending that the *search* was based upon probable cause and in citing *Santibanez,* the Government was arguing for the established principle that an officer has probable cause to search when he smells the odor of marijuana, *see United States v. Santibanez,* 517 F.2d 922, 923 (5th Cir. 1975). But the Government was in no way disputing the fact that the *stop* had been made only because the chekar

hearing is required when no issues of fact are controverted in a section 2255 proceeding.[3] This case is different, *not* because the facts are in dispute, but because in all other cases involving only issues of law, the prisoner lost, so that those decisions arguably fall within the statutory class of cases where it conclusively appears that "the prisoner is entitled to no relief." In the instant case, no facts are contested, but—far from showing that the Sosas are entitled to no relief—the files and records conclusively demonstrate that the Sosas are entitled to full relief.[4]

The statute's literal terms would seem to require a hearing in these circumstances.

device had been triggered, nor could it have disputed the fact that the Hebbronville chekar device did not amount to a "functional equivalent" of the border which might have permitted a *stop* without reasonable suspicion. *See United States v. Del Bosque,* 523 F.2d 1251, 1252 (5th Cir. 1975); *United States v. Estrada,* 526 F.2d 357, 358 (5th Cir. 1976). And as long as the stop was illegal, the legality of the subsequent search was irrelevant.

Finally, the argument that the notoriety of the roads and the time of night constituted the "reasonable suspicion" necessary to justify a stop by a roving patrol presented only a question of law that we have already decided adversely to the Government. *See United States v. Partner,* 527 F.2d 1337, 1338 (5th Cir. 1976) (no reasonable suspicion where vehicle was traveling on Highway 16 at 1:15 a. m.). *Compare United States v. Estrada,* 526 F.2d 357, 358 (5th Cir. 1976) (finding reasonable suspicion where, in addition to road's notoriety and time of night, suspect vehicle pulled over when Border Patrol agents stopped another vehicle and then fled when agents approached).

The Supreme Court has made it quite clear that when a section 2255 applicant alleges facts which are "vague, conclusory, or palpably incredible," no evidentiary hearing need be held, *Machibroda v. United States,* 368 U.S. 487, 495, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962); *accord Sanders v. United States,* 373 U.S. 1, 21, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963) (court may take steps short of evidentiary hearing to ascertain if allegations are "substantial"); Rule 7, Rules Governing Section 2255 Proceedings (effective February 1, 1977) (providing for "expansion of record" by inclusion of documentary materials before making final determination that evidentiary hearing is necessary). In the instant case the Government did not allege any new facts or contest any old facts that might have influenced the trial court's resolution of the "deliberate bypass" and reasonable suspi-

The Supreme Court, however, has rejected the "plain meaning" approach as a method of statutory interpretation, and has itself read another part of section 2255 in a fashion that was admittedly at odds with the literal terms of the statute. It may be that the scope of section 2255's hearing requirement is as broad as the statute's literal sweep. But if *Price v. Johnston, Standard Oil Co. v. United States, United States v. American Trucking Ass'n,* and *Sanders v. United States* teach us anything about statutory interpretation, their lesson must be that fidelity to Congressional purpose often requires that a statute be given a less expansive construction than its literal terms might otherwise permit. I therefore turn to the task of ascertaining the scope of section 2255's hearing requirement in light of the purpose of section 2255.

### B. The Purpose of Section 2255's Hearing Requirement

I do not mean to disregard the language of section 2255 which requires a hearing unless the files and records conclusively show that the prisoner is entitled to no relief. I do intend, however, to ask whether Congress in employing that language meant to enable the Government to insist

that useless evidentiary hearings be held, or whether Congress meant only to specify the conditions under which a prisoner could demand an evidentiary hearing as a matter of right. It may well be that in devising the section 2255 motion procedure, Congress did not address the problem of a "conclusive" loss for the Government.[5]

In attributing legislative purpose, a court begins with the assumption that Congress acted reasonably in establishing the section 2255 hearing procedure. The question then immediately arises: why would a reasonable legislature require courts to hold evidentiary hearings when no facts are disputed, and why would a reasonable legislature require oral argument when the parties' written submissions are sufficient to decide a case? The function of an evidentiary hearing is to resolve contested issues of fact. *See Townsend v. Sain,* 372 U.S. 293, 309 & n. 6, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). If the facts are not disputed, an evidentiary hearing is useless. And oral argument concerning issues of law—if not necessary to improve the court's understanding of the issues—is a luxury at best. I find it difficult to credit the argument that Congress in enacting section 2255 meant to have the federal courts make much ado about nothing.[6] I would therefore hold that where the

cion issues raised by the response. The probable cause claim was irrelevant; the stop, not the search, tainted any evidence seized. Since none of these issues could have been illuminated by an evidentiary hearing, none was required. "The language of the statute does not strip the district courts of all discretion to exercise their common sense." *Machibroda v. United States,* 368 U.S. 487, 495, 82 S.Ct. 510, 514, 7 L.Ed.2d 473 (1962).

5. For this reason, maxims of construction such as *expressio unius est exclusio alterius* are not particularly helpful in the instant case. If Congress meant only to define those situations in which a prisoner must be afforded a hearing, then the maxim is inapplicable because *ex hypothesi* Congress expressed nothing about the Government's ability to demand a hearing. I need not, however, align myself with those commentators who have contended that for every maxim of construction there is always an opposite, *see* Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are to be Construed,* 3

Vand.L.Rev. 38 395, 401–08 (1950), or that the maxims "are useful only as facades, which for an occasional judge may add lustre to an argument persuasive for other reasons," Newman & Surrey, Legislation—Legislation—Cases and Materials 654 (1955). Instead, maxims "should not be treated, any more than a dictionary, as saying what meaning a word or group of words *must* have in a given context. They simply answer the question whether a particular meaning is linguistically permissible, if the context warrants it." H. M. Hart & A. Sacks, *supra* note 2, at 1221 (emphasis in original).

6. *See Sorrells v. United States,* 287 U.S. 435, 446, 53 S.Ct. 210, 214, 77 L.Ed. 413 (1932) (Hughes, C. J.) ("Literal interpretation of statutes at the expense of the reason of the law and producing absurd consequences or flagrant injustice has frequently been condemned."); *United States v. Kirby,* 74 U.S. 482, 486, 7 Wall. 482, 486, 19 L.Ed. 278 (1868) ("All laws should receive a sensible construction." *Held,* statute proscribing wilful interference with mail deliv-

files and records of a case conclusively show that the petitioner is entitled as a matter of law either to no relief or to full relief, the section 2255 court may—and indeed should—enter the appropriate order without holding an evidentiary hearing or oral argument.

If I believed that Congress meant section 2255 to require a hearing in all cases where the petitioner's claim is not rebutted by the files and records, I could hardly maintain that the section 2255 court need not hold redundant evidentiary hearings and listen to unnecessary oral argument. But the legislative history of section 2255 belies any such Congressional purpose.

Prior to the revision of the Judicial Code in 1948, it was common practice for federal habeas courts to grant relief without holding a hearing if no facts were contested and no useful purpose could be served by oral argument. As stated in the leading case of *Walker v. Johnston*, 312 U.S. 275, 284, 61 S.Ct. 574, 578, 85 L.Ed. 404 (1941): "[O]n the facts admitted, it may appear that, as matter of law, the prisoner is entitled to the writ and to a discharge. This practice has long been followed by this court and by the lower courts."[7] A thorough sifting of the legislative history of section 2255 fails to unearth even a shard of evidence suggesting that Congress meant to change this practice. Instead, section 2255 was enacted to permit federal prisoners to seek postconviction relief in a court other than the district of confinement (where all habeas petitions had to be filed). The Supreme Court made this limited administrative purpose emphatically clear in *United States v. Hayman*, 342 U.S. 205, 72 S.Ct. 263, 96 L.Ed. 232 (1952), the first section 2255 case to reach the Court:

"[T]he *sole purpose* was to minimize the difficulties encountered in habeas corpus hearings by affording the same rights in another and more convenient forum.
. . . The *very purpose* of Section 2255 is to hold any required hearing in the sentencing court because of the inconvenience of transporting court officials and other necessary witnesses to the district of confinement." (Emphasis added.) 342 U.S. at 219–221, 72 S.Ct. at 272–273; *accord*, H.R.Rep. No. 2646, 79th Cong., 2d Sess. (1946) 7; H.R.Rep. No. 308, 80th Cong., 1st Sess. (1947) A120; S.Rep. No. 1559, 80th Cong., 2d Sess. (1948) 8–10.

Surely Congress, in attempting to more equally distribute the judicial business of federal habeas corpus petitions did not intend to saddle the federal courts under the new procedure with the responsibility of needless hearings, not required under the old, when the merits of a section 2255 motion can be conclusively determined on the basis of the files and records. The beneficiary of the "hearing" to which section 2255 refers was to be the prisoner, not the Government, for the section 2255 procedure represented a reduction in the number of hearings which some courts had felt compelled to afford a petitioner on successive applications. *See* the discussion of Chief Judge Parker, Chairman of the Judicial Conference Committee which drafted section 2255, in *Limiting the Abuse of Habeas Corpus*, 8 F.R.D. 171, 174–75 (1949).

I do not dispute that public policy requires that the Government be given notice and an opportunity to respond when there is a possibility that a criminal conviction will be vacated. But I can find no evidence in the legislative history of section 2255 indicating that the Government need be "heard" via an evidentiary hearing and oral argument. Rather, those procedures should be reserved for cases in which they could contribute to the court's understanding or the Government's articulation of its position. If the Government does not dispute the petitioner's version of the facts, I cannot imagine a responsible United States

ery did not prohibit arrest of on-duty mailman for murder.)

7.  *Accord, e. g., Dorsey v. Gill*, 80 U.S.App.D.C. 9, 148 F.2d 857, 866 (1945) ("the judge may find that the facts admitted—in response to the order to show cause—entitle the petitioner to the writ and to a discharge, forthwith, as a matter of law; or he may find that an issue is involved; in which event he should grant the writ and require a hearing").

attorney insisting on an evidentiary hearing; and the utility of oral argument on issues of law is best left to the informed discretion of the section 2255 court.

My conclusion that no hearing is *required* by section 2255 when no facts are disputed and when oral argument is not helpful, is buttressed by the Supreme Court's consistent holding that the remedies available under section 2255 are "exactly commensurate with that which had previously been available by habeas corpus in the court of the district where the prisoner was confined", *Hill v. United States*, 368 U.S. 424, 427, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962); *accord, e. g., Davis v. United States*, 417 U.S. 333, 334, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974); *United States v. Morgan*, 346 U.S. 502, 511, 74 S.Ct. 247, 98 L.Ed. 248 (1954); *United States v. Hayman*, 342 U.S. 205, 214–229, 72 S.Ct. 263, 96 L.Ed. 232 (1952); *Larson v. United States*, 275 F.2d 673, 676 n. 5 (5th Cir. 1960). Given the fact that summary disposition of habeas petitions in the prisoner's favor was common prior to the enactment of section 2255, and the lack of any indication that Congress sought to alter this practice, I believe that to force a section 2255 applicant to endure the rigamarole of needless hearings would ignore the teaching of those Supreme Court decisions.[8]

### C. The *Ferrara* Case

My interpretation here is not inconsistent with our recent decision in *Ferrara v. Unit-ed States*, 547 F.2d 861 (5th Cir. No. 76–1426, 1977). In *Ferrara*, the prisoner filed a section 2255 motion to have his conviction and sentence vacated "on the ground that the government had failed to correct the testimony of its key witness, allegedly known by the government to have perjured himself." 547 F.2d at 862. The Government filed a general denial as an answer, and the district court granted the motion without a hearing. We reversed.

The crucial distinction between *Ferrara* and the instant case is that in *Ferrara* the Government contested the facts, *i.e.*, whether perjury did occur and whether the Government knowingly used perjured testimony, *see* 547 F.2d 861 at 862, while in this case the Government opposed the section 2255 motion solely on legal grounds. Properly read, *Ferrara* stands only for the proposition that *the section 2255 motion cannot be granted without a hearing when the Government contests the petitioner's version of the facts.* Our statement in *Ferrara* that "[g]ranting [section 2255] relief . . . without a hearing is not authorized by statute," 547 F.2d at 863, was partially dictum. Moreover, our suggestion that *Fontaine v. United States*, 411 U.S. 213, 215, 93 S.Ct. 1461, 36 L.Ed.2d 169 (1973); *Reed v. United States*, 441 F.2d 569, 572 (9th Cir. 1971); and *Tucker v. United States*, 138 U.S.App. D.C. 345, 427 F.2d 615, 617 (1970), had construed section 2255 "in accordance with its literal language" must be understood in

---

**8.** I note that this construction of section 2255 is entirely congruent with the recently-approved Rules Governing Section 2255 Proceedings. *See* Pub.L. 94–426, § 1, Sept. 28, 1976, 90 Stat. 1334. The new Rules, which are effective February 1, 1977, provide rather strong evidence that neither Congress nor the Supreme Court has ever taken the hearing requirement of section 2255 literally. Rule 8(a) provides:

> "If the motion has not been dismissed at a previous *stage* in the proceeding, the judge, after the answer is filed and any transcripts or records of prior court actions in the matter are in his possession, shall, upon a review of those proceedings and of the expanded record, if any, determine whether an evidentiary hearing is required. *If it appears that an evidentiary hearing is not required, the judge shall make such disposition of the motion as justice dictates."*

Section 2255 Rules, *reprinted in* 1976 U.S. C.A. Supplement 4, at 1387 (Dec.1976). (Emphasis added.)

The Advisory Committee note accompanying Rule 8 says that the "standards for § 2255 hearings are essentially the same as for evidentiary hearings under a habeas petition, except that the previous federal fact-finding proceeding is in issue rather than the state's." This is particularly significant because under the habeas procedure outlined in *Townsend v. Sain*, 372 U.S. 293, 312–313, 318, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), no evidentiary hearing is required when state factfindings are not disputed. *Accord, Wright v. Dickson*, 336 F.2d 878, 881 (9th Cir. 1964) ("Only if it appears from undisputed facts . . . that as a matter of law [a prisoner] is entitled to discharge, or that as a matter of law he is not, may an evidentiary hearing be avoided.").

light of the actual facts and holdings of those three cases. *Fontaine, Reed,* and *Tucker* all reversed lower court decisions where the petition had been dismissed—not granted—without a hearing although the prisoner alleged facts which, if proved at an evidentiary hearing, would have entitled him to relief. Those cases merely applied the earlier Supreme Court decision of *Sanders v. United States,* 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963), which announced a comprehensive set of rules specifying when a petition could be dismissed without a hearing. Neither they nor *Ferrara* confronted the question whether section 2255 hearings must be held when the parties raise only questions of law.

I would affirm the judgment of the district court.